IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIENNA HORNBACK, | No. C 05-00508 SBA |
| Plaintiff, | **ORDER** |
| v. | [Docket Nos. 29 & 30] |
| NEW YORK TIMES COMPANY LONG TERM DISABILITY PLAN, et al., | |
| Defendants. | |

This matter comes before the Court on plaintiff Sienna Hornback's ("Plaintiff") motion for partial summary judgment [docket no. 29] and defendant New York Times Company Long Term Disability Plan's ("Defendant") cross-motion for summary judgment [docket no. 30]. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing. The Court hereby DENIES Plaintiff's motion for partial summary judgment and GRANTS Defendant's motion for summary judgment.

## **BACKGROUND**[1]

**A.   Facts**

    1.   <u>Initial Review and Denial of Plaintiff's Claim</u>

In May of 2002 Plaintiff, a woman in her mid-thirties who was employed at the Press Democrat newspaper as a Marketing Manager, began suffering from arm pain. She stopped working on August 12, 2002. On December 5, 2002 Plaintiff submitted an application for long-term disability benefits to

---

[1] The facts are undisputed and taken from the administrative record.

1 Defendant, claiming she was unable to use her arms or sit for extended periods of time. (D 106, 109.[2])
2 She was diagnosed by her medical providers with Thoracic Outlet Syndrome and Cervical Joint
3 Dysfunction. (D 124-26.) Her chiropractor, Dr. Alan Goldhamer, deemed her totally disabled.

4       On June 24, 2002, Dr. Kevin Satow completed an "Upper Extremity Electrodiagnostic
5 Evaluation" of Plaintiff. Dr. Satow's impression was "normal electrophysiologic studies of the right
6 upper extremity." (D 54). The report noted "normal media studies of the right upper extremity, arguing
7 against a carpal tunnel syndrome or pronator syndrome." (*Id.*)

8       Dr. Goldhamer referred Plaintiff to Dr. Gail Dubinsky and, on August 9, 2002, Plaintiff met with
9 Dr. Dubinsky for a medical examination and consultation. (D 87). During the consultation Plaintiff
10 provided Dr. Dubinsky with her history, including a description of her position which was: "does
11 computer work, which is not constant, a lot of writing forcibly through multiple copy carbons, and
12 proofs ads, does telephone work and goes to meeting[s]." (*Id.*) In a letter dated that day to Dr.
13 Goldhamer, Dr. Dubinsky summarized her impression as follows: "[Plaintiff] appears to have suffered
14 a fairly 'routine' cumulative trauma/overuse syndrome of the right, much greater than the left, upper
15 extremity." (D 089.) Dr. Dubinsky recommended acupuncture, natural medications (ex. bromelain and
16 papaya, B-complex) and yoga. (*Id.*)

17       Dr. Goldhamer also referred Plaintiff to Randall Willens, L.Ac., for acupuncture treatment. In
18 an acupuncture report dated September 18, 2002 the acupuncturist states as his objective findings
19 "exquisite tenderness to light palpation on arms, extreme sensitivity to acupuncture on arms or legs; very
20 tight paraspinal muscles at T3-8." (D 51.)

21       Plaintiff saw Dr. Dubinsky again on September 19, 2002. (D 98.) This session was spent only
22 in discussion with Plaintiff and no examination was conducted. Plaintiff indicated that she had not
23 improved since her last visit. Additional treatment options were discussed, including visiting Dr. Tracy
24 Newkirk, a specialist in Thoracic Outlet Syndrome.

25       On October 15, 2002, Plaintiff met with Dr. Newkirk. (D 101.) Dr. Newkirk noted that Plaintiff
26 "does a lot of computer work as a marketing manager." (*Id.*) The neurological examination was normal.

27
28     [2] All references "D___" are cites to the administrative record.

1  (*Id.*)  Dr. Newkirk recommended Plaintiff be referred to Dr. David Feinberg for a MRI/MRA[3]. Dr.
2  Newkirk also recommended work station modifications and the need to get up 3 or 4 times an hour to
3  stretch.  Finally, Dr. Newkirk noted if Plaintiff still "has hand and supra-clavicular edema and palpable
4  dystonia, she will not be able to return to work."  (*Id.*)

5  Plaintiff met with Dr. Dubinsky again on November 4, 2002 (D 104) and the diagnosis again was
6  Thoracic Outlet Syndrome.

7  Video surveillance conducted on December 12 and 13, 2002 as part of Plaintiff's application for
8  workers' compensation showed Plaintiff walking, bending, carrying a child and bag of groceries and
9  driving, using her arms in a full and unrestricted manner.

10  In response to the report of the video surveillance, Dr. Goldhamer sent a letter to Defendant
11  stating that the activities revealed in the video worsen Plaintiff's condition and, in any event, were not
12  the "fine motor activities" associated with her job.  (D 138.)

13  On January 20, 2003, Dr. Amy Hopkins performed an independent physician consultant review
14  for Defendant.  (D 132-34.)  Dr. Hopkins concluded that Plaintiff appeared to have a repetitive strain
15  injury of the right arm and that Plaintiff's symptoms were inconsistent with her self-reported functional
16  abilities.  Consequently, Dr. Hopkins stated "it was difficult to ascertain from this file what [Plaintiff's]
17  actual functional capabilities are.  An upper extremity FCE[4] with repetitive testing matched to
18  employee's occupation or job (depending on the contract) would be useful at this time to determine her
19  capabilities."  (*Id.*)

20  On January 27, 2003 Dr. Feinberg performed an MRI of the thoracic outlet and brachial plexus
21  and MR Angiogram of both right and left shoulders of Plaintiff.  (D 136.)  The tests showed a
22  "narrowing of the left thoracic outlet constricting the cords of the brachial plexus on the left side with
23  the arms in the raised position" and the "right thoracic outlet and brachial plexus appear normal." (*Id.*)

24  On February 3, 2003, Dr. Hopkins submitted another report after receiving the surveillance video

---

[3] Magnetic resonance imaging (MRI) is a method of producing extremely detailed pictures of body tissues and organs without the need for x-rays.  MR angiography (MRA) is an MRI study of the blood vessels.

[4] "FCE" is a functional capacity evaluation.

3

of Plaintiff. (D 137.) Dr. Hopkins noted that Plaintiff was able to use her arms in a full and unrestricted manner with no obvious evidence of any discomfort or impairment, and that no FCE was necessary since Plaintiff was observed "performing activities equivalent to her own occupation." (*Id.*)

On February 21, 2003, upon review of Dr. Feinberg's findings, Dr. Hopkins submitted another report that noted the positive findings were on Plaintiff's left side, not the right, but it was on the right side that Plaintiff complained of debilitating pain. (D 140.) Thus, Dr. Hopkins concluded the clinical relevance of the MRI had not been established. (*Id.*)

On March 12, 2003, the claims administrator for Defendant denied Plaintiff's initial claim for benefits, concluding that the medical documentation provided did not support the presence of severe physical or functional impairments that would prevent her from performing the duties of her occupation. (D 150-153.)

On April 29, 2003, Plaintiff underwent a neurological medical examination by Dr. Daniel Shalom at the request of the insurer involved in Plaintiff's request for workers' compensation benefits. (D 154.) On May 28, 2003 Dr. Shalom issued his report. (*Id.*) He noted: "[d]espite rather dramatic statements regarding the serious and advanced nature of her condition . . . her physical examination does not seem to support this level of symptomatology." (D 159.) He further stated "There is a scarcity of objective factors of disability." (D 162.) He recommended limiting repetitive forceful grasping, repetitive pushing and pulling and repetitive work at shoulder level or higher. With regard to computer use, he suggested a proper ergonomic setup would "go a long way" towards helping this. (*Id.*)

2.  <u>First Appeal and Subsequent Denial of Plaintiff's Claim</u>

Plaintiff appealed the denial of benefits on September 4, 2003. The appeal and the administrative file were referred to an independent medical examiner, Dr. John D. Thomas, a board-certified practitioner in physical medicine and rehabilitation. On November 3, 2003, Dr. Thomas issued his Physician Consultant Review. (D 186-96.) Dr. Thomas noted that Plaintiff's doctors' declarations of total disability were at odds with the normal electrodiagnostic reports, the MRI/MRA testing revealing structures within normal limits for her right side (the side which Plaintiff complained of), and the surveillance video. (D 195.) Based upon his review, "speaking as a board-certified practitioner in physical medicine and rehabilitation, really looking mostly carefully at Dr. Shalom's QME and the job

4

description I have dated 1.31.03,[5] it would seem [Plaintiff] retains the ability to function at that level/try that job."  (D 196.)

On November 4, 2003, the claims administrator upheld the denial of disability benefits.

### 3. Second Appeal and Denial of Plaintiff's Claim

On February 4, 2004, Plaintiff submitted her appeal of the denial to the ERISA Management Committee.  The appeal materials and administrative file were forwarded to another independent medical examiner, IPRO.  IPRO had the administrative record reviewed by a physician board-certified in physical medicine, rehabilitation, pain medicine and electro-diagnostic medicine, Dr. Philip Marion.  Upon review, the IPRO found that the medical documentation and video surveillance did not support a level of limitation or severity of impairment that would preclude Plaintiff from performing her job. (D 6).

On May 10, 2004, the ERISA Management Committee notified Plaintiff, through her attorney, that it had held a special meeting to review Plaintiff's appeal and denied it.

## B. Relevant Plan Provisions[6]

The Plan is governed by the Employee Retirement Income Security Act ("ERISA").

Under the Plan "Totally Disabled" or "Total Disability" is defined, in relevant part, as:

   (a) during the first 24 months of disability, that the Participant is unable, because of injury or illness, to perform all of the duties of his occupation; and

   (b) thereafter, that the Participant is unable, because of injury or illness, to engage in any gainful occupation or profession for which he is reasonably qualified or reasonably could become qualified by education, experience, capability or training.

(D 14 & 492.)  A Participant of the Plan is required to submit proof, including the statements of one or more duly qualified physicians, initially and from time to time, as evidence of his Total Disability or of the continuation of such Total Disability.  (D 26 & 508.)

---

[5] This job description was taken from the Department of Labor's Dictionary of Occupational Titles.

[6] The parties cite to different versions of the Plan.  The Plan at the time of Plaintiff's work stoppage was the Plan, restated effective January 1, 1986, with six amendments thereto.  The Plan was restated effective on July 1, 2003.  The definition of "Total Disability" is identical.

5

Effective January 1, 2002, Section 6.3 of the Plan was amended to read as follows:

> Section 6.3  <u>Administrative Procedures.</u>  The [ERISA Management Committee] shall have sole authority and discretion to administer and construe the terms of the Plan, subject to applicable requirements of law.  Without limiting the generality of the foregoing, the Committee shall have complete discretionary authority to carry out the following powers and duties:
>
> (a) To make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan;
>
> (b) To interpret the Plan, its interpretation thereof to be final and conclusive on all persons claiming benefits under the Plan;
>
> (c) To decide all questions concerning the Plan, including without limitations, any issues of fact, and the eligibility of any person to participate in, and receive benefits under the Plan; and
>
> (d) To appoint such agents, counsel, accountants, consultants and other persons as may be required to assist in administering the Plan.

(D 36.)

**C.  Procedural History**

Plaintiff filed the instant complaint on February 3, 2005 against Defendant [New York Times Company Long Term Disability Plan], Metropolitan Life Insurance Company, New York Times Company Flexible Benefits Program, New York Times Company Supplemental Retirement and Investment Plan, and New York Times Company Pension Plan.  By Stipulation and Order dated July 7, 2005, Metropolitan Life Insurance Company was dismissed from the case without prejudice [docket no. 24.]

On September 14, 2005, Plaintiff and Defendant filed cross-motions for summary judgment [docket nos. 29 & 30.]

By Stipulation and Order dated October 12, 2005, New York Times Company Flexible Benefits Program, New York Times Company Supplemental Retirement and Investment Plan, and New York Times Company Pension Plan were dismissed from the case with prejudice [docket no. 47.]

## LEGAL STANDARD

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the initial burden of demonstrating the "absence of a genuine issue of material fact." *Id.* at 323. If the movant meets this burden, the nonmoving party must come forward with specific facts demonstrating a genuine factual issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### B. Standard of Review of ERISA Action

Pursuant to 29 U.S.C. § 1132(a)(1)(B), an individual may bring a civil action to recover benefits due him from an ERISA plan. The Supreme Court has established a standard of review for an action brought under § 1132(a)(1)(B): "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co.*, 489 U.S. 101, 115 (1989). If the plan provides such discretion, then abuse of discretion is the applicable standard. *Friedrich v. Intel*, 181 F.3d 1105, 1109 (9th Cir. 1999); *see also Taft v. Equitable Life Assur. Soc.*, 9 F.3d 1469, 1471 (9th Cir. 1993) (Where the plan vests the administrator with discretionary authority to determine eligibility of benefits or to construe the terms of the plan, a district court may review the administrator's determinations only for an abuse of discretion.)

Under the abuse of discretion standard, courts should defer to the administrator's final decision unless it was "arbitrary and capricious." *See Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279, 1285 (9th Cir. 1990). Under an abuse of discretion review, the dispositive issue is whether the denial of benefits was unreasonable. *See*

*Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 553 (9th Cir. 1995). A plan administrator abuses its discretion if it provides no explanation for its decision, reaches a conclusion in conflict with the plan's plain language, or bases its decision on clearly erroneous findings of fact. *Atwood v. Newmont Gold Co ., Inc.*, 45 F.3d 1317, 1323-4 (9th Cir. 1995). A plan administrator also abuses its discretion if it denies a claim without obtaining relevant information. *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997). It is the Plaintiff's burden to prove entitlement to ERISA plan benefits. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 63 F.Supp.2d 1145, 1155 (C.D. Cal. 1999); *see also Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F.Supp.2d 1222, 1232 (N.D. Cal. 2003) (court concluded that Plaintiff must carry the burden to prove that she was disabled under the meaning of the plan).

## ANALYSIS

Defendant determined that Plaintiff had not proven her entitlement to long term disability benefits. It found the medical documentation did not support the presence of severe physical or functional impairments that would prevent Plaintiff from performing the duties of her occupation. (D 152.) Section 6.3 of the Plan unambiguously grants discretionary authority to the plan administrator. Thus, abuse of discretion is the appropriate standard of review for this Court.[7] Under the abuse of discretion standard, this Court must defer to the administrator's final decision unless it was arbitrary and capricious. Based upon a thorough review of the administrative record, the Court finds Defendant did not abuse this discretion.

**A.     Defendant Did Not Abuse Its Discretion**

   1.     The administrator provided an explanation for its decision

In the first denial of benefits, on March 12, 2003, the claims administrator discussed the relevant provisions of the plan. It then explained what materials it reviewed in reaching its decision, including the surveillance video of Plaintiff. It determined that, contrary to Plaintiff's assertion that she was unable to use her arms at all, the surveillance video disclosed Plaintiff

---

[7]The parties agree that the proper standard of review is abuse of discretion.

8

performing several activities with her arms with no braces or physical limitations observed. (D 151.) The March 12, 2003 letter observed that Plaintiff's claim had been referred to an Independent Physician Consultant ("IPC") who had reviewed her claim (Dr. Hopkins) and concluded that Plaintiff's medical information showed a repetitive strain injury to the right arm which "oddly" had worsened and not improved since Plaintiff left work in August, 2002. (D 152.) Further, the IPC review noted that Plaintiff's child-care activities appear to be strenuous, if not more so than her work activities. It concluded that while Plaintiff "may have pain . . . no physical impairment was documented that would preclude [Plaintiff] from performing [her] own occupations full-time." (*Id.*) A copy of this IPC review was provided to Plaintiff's physician Dr. Goldhamer for his review and comment.

The March 12, 2003 letter further noted that the recommendations of another of Plaintiff's treating physicians, Dr. Newkirk, were contradictory and were not supported by any objective evidence of Dr. Newkirk's opinion that Plaintiff was disabled from work. The letter stated that Dr. Newkirk recommended rollerblading, running and skiing, but then conversely advised against any activities that required any forward movement of the arms. It was unclear why Dr. Newkirk would encourage Plaintiff to participate activities that may exacerbate Plaintiff's Thoracic Outlet Syndrome and potentially cause serious injury. The clinical studies, i.e. the MRI/MRA, showed a narrowing of the thoracic outlet on the *left* side, not the right, which is the region Plaintiff claimed she was most symptomatic; the results from the right side appeared normal. In short, Plaintiff did not satisfactorily prove, as required, that she was disabled from her occupation.

The second denial letter of November 4, 2003 likewise included an explanation for the denial. (D 197-201.) The letter noted that the documentation submitted in support of her claim for disability benefits failed to reveal the presence of severe physical or functional impairment that would prevent her from performing her duties. The letter noted normal electrodiagnostic evaluation of the right upper extremity conducted by Dr. Satow; the MRI/MRA tests which showed a normal right thoracic outlet and brachial plexus; the notes of Dr. Goldhamer who stated, as of February 6, 2003, Plaintiff was making substantial clinical improvement; the May

9

28, 2003 report of Dr. Shalom stating there was a scarcity of objective factors of disability; and the independent physician consultant review of Dr. Thomas who stated that, after reviewing the medical documentation in Plaintiff's file, he believed Plaintiff retained the ability to function at her occupational level.

Finally, the May 10, 2004 letter upholding the previous denial of benefits informed Plaintiff that the ERISA Management Committee submitted the entire claims file to IPRO, a third party independent health care review, and IPRO concluded that Plaintiff was not disabled. All of the evidence reviewed by IPRO had already been provided to, or submitted by, Plaintiff.

2. <u>The administrator did not reach a conclusion in conflict with the plan's language</u>.

"Total Disability" was defined as the inability of the plan participant "during the first 24 months of disability . . . to perform all of the duties of [her] occupation." Occupation was not defined by the Plan. Defendant defined occupation as "the activity you regularly perform and that serves as your income. It is not limited to a specific position with a specific employer and could be performed with your employer or any other employer. (D 150-53.)

Defendant was entitled to define occupation generally, and not limit it to the position Plaintiff had with her employer. *See Benedixen v. Standard Ins. Co.*, 185 F.3d 939, 943 (9th Cir. 1999) (administrator of long-term disability ERISA plan did not abuse its discretion in concluding that participant was not disabled since she could still work in her own occupation with another employer, and thus was not entitled to benefits); *see also Ehrensaft v. Dimension Works Inc. Long Term Disability Plan*, 120 F.Supp.2d 1253, 1259 (D.Nev. 200) (occupation was general term, and did not refer to alleged particular tasks of insured's particular job).

Furthermore, it was not unreasonable for Defendant to look to the Department of Labor's Dictionary of Occupational Titles ("D.O.T.") for a description of Plaintiff's occupation. *See Dionida v. Reliance Standard Life Ins. Co.*, 50 F.Supp.2d 934, 940 n.4 (N.D.Cal. 1999) ("Given the amount of research and analysis that has gone into grouping similar jobs and defining the occupational titles, and the length of time the D.O.T. has been widely used, it is reasonable for plan administrators, and courts, to use it for determining a claimant's 'regular occupation.' "). Defendant chose the D.O.T. job description of "Manager - Newspaper

10

1 Circulation" since it involved comparable job duties of Plaintiff in providing sales and
2 promotional support for a newspaper. According to Plaintiff's own job description the purpose
3 of her job was to provide "sales and promotional support" to the newspaper. (D 130.) The
4 Defendant's chosen job description states "directs sale and distribution of newspapers." (D
5 141.) This job description was of the same general character as Plaintiff's occupation. *See*
6 *Dionida*, 50 F.Supp.2d at 941.

Moreover, in addition to the D.O.T. job description, Defendant made available Plaintiff's own job description which was considered and incorporated in Dr. Shalom's evaluation. He noted Plaintiff "probably would need a partial restriction from keyboarding or mousing, such that she did neither activity no more than 10 minutes at a time, and with a rest break of no less than an hour after such activity." (D 169.) However, Dr. Shalom also noted that he believed there was a "substantial subjective component to the [Plaintiff's] presentation" and "that she is not as functionally limited as she may even herself believe." (*Id.*) Thus, there is evidence in the administrative file that even taking into consideration Plaintiff's specific job description, Plaintiff was not deemed disabled from work.

### 3. Defendant's decision was not based on clearly erroneous findings of fact

As noted above, there is evidence in the administrative record which supports Defendant's denial of benefits. There was a lack of objective findings of disability (Dr. Shalom's report of a "scarcity of objective factors of disability"), the medical professionals who did find total disability were inconsistent in their advice and reporting to Defendant as to the degree of Plaintiff's condition (Dr. Newkirk's advice to rollerblade, run and swim while simultaneously counseling against any forward movement of the arms), and there was evidence suggesting Plaintiff was malingering (video surveillance of Plaintiff using her arms without signs of discomfort). Based on the above, it was not clearly erroneous for Defendant to find Plaintiff was not totally disabled.

For the foregoing reasons, this Court GRANTS Defendant's motion for summary judgment.

**B.     Plaintiff's Motion for Partial Summary Judgment Fails**

11

In her motion for summary judgment, Plaintiff asserts Defendant abused its discretion in five ways: 1) Defendant improperly found Plaintiff not disabled though it is estopped from adopting such a position since Plaintiff was fired because of her disability, 2) Defendant never adequately considered the restriction which rendered Plaintiff disabled, the need to operate a computer, 3) Defendant used incorrect job descriptions, 4) Defendant is bound by the Social Security Administration finding that Plaintiff is disabled, and 5) Defendant failed to afford her a full and fair review because it "unfairly sprung" on Plaintiff a medical review report which was the predicate for the final denial without also affording her the opportunity to review and comment on the report.[8]

### 1. Plaintiff was not fired because of her disability

The Press Democrat, Plaintiff's former employer and <u>not</u> a defendant in this complaint, sent Plaintiff a letter in July of 2003[9] stating it was unable to identify possible ways to reasonably accommodate her condition in light of Dr. Shalom's recommendations, and so it appeared Plaintiff "may no longer be qualified for continued employment." (D 171.) The letter further stated "We would like to discuss with you further, however, and obtain any thoughts, information or ideas you may have on this subject. We therefore ask that you contact [us] to schedule an appointment to do so. If we do not hear from you by August 7, 2003, we will assume that you are not interested in returning to work." (*Id.*)

Plaintiff cites to this letter as the basis for estoppel. The Ninth Circuit has limited

---

[8] Plaintiff also alleges Defendant indulged in an inappropriate bias against her, however, Plaintiff does not explain how such a contention is relevant to a review of an administrator's decision under the abuse of discretion standard. The lone authority Plaintiff cites in support of this contention concerns the application of the *de novo* standard of review. *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999). Courts will apply the abuse of discretion standard unless the affected beneficiary comes forward with evidence indicating that a conflict of interest caused a breach of the administrator's fiduciary duty to the beneficiary. *Id.* (citing *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1322-23 (9th Cir.1995)). Plaintiff has not alleged Defendant breached its fiduciary duty to her, nor that there is a conflict of interest. Moreover, there is no dispute that the abuse of discretion standard is the correct one in this case. Thus, Plaintiff has failed to demonstrate why its allegations of bias on the part of Defendant are relevant to this Court's consideration of her motion for summary judgment.

[9] The date on the letter is "July 24, 2004," however this appears to be a typographical error. The parties agree that the correct date is July 24, 2003. *See* Points and Authorities in Support of Plaintiff's Partial Summary Judgment Motion, at 20 & Defendant's Points and Authorities in Opposition to Plaintiff's Partial Summary Judgment Motion, at 13-14.

claims of estoppel to situations where an employee relied to his detriment on representations made in regard to ambiguous language in an employee benefits plan. *See DeVoll v. Burdick Painting, Inc.*, 35 F.3d 812, 821 (9th Cir. 1992) (citations omitted). Plaintiff does not provide any facts suggesting she relied on this letter from the Press Democrat to her detriment, nor that it contained representations made in regard to any ambiguous language of the Plan. In fact, the letter does not refer to the Plan at all. The letter is an invitation for Plaintiff to engage in continued discussions with the Press Democrat about finding ways to accommodate her work restrictions (assuming that she was interested in returning to work). Plaintiff does not indicate whether she ever accepted the invitation, nor even whether she responded at all to the Press Democrat. In short, Plaintiff has proven nothing concerning Defendant's alleged abuse of discretion with this letter.

2. <u>Defendant adequately considered the need for Plaintiff to operate a computer</u>

Plaintiff's job description, which stated at least five hours of computer use was required, was appropriately reviewed and considered in the claims process. Dr. Shalom had an opportunity to review and comment on it. (D 169.) Furthermore, Defendant expressly directed the IPRO reviewer to consider this job description (*see* D 235) ("Your reviewer should review this file based on the job description for Marketing Manager - Advertising/Online/Circulation Support that was provided by the claimant's employer") and the IPRO reviewer specifically noted in his report that he considered this description (*see* D 241 ("The job description for Marketing Manager - Advertising/Online/Circulation Support ... was also reviewed."). The IPRO reviewer still determined that the denial of benefits should be upheld. (D 241.)

3. <u>Defendant did not use improper job description</u>

For the reasons noted above, Defendant was reasonable in defining occupation as it did and turning to the D.O.T. for a comparable job description (see section A.2. *infra*.)

4. <u>Defendant is not bound by the Social Security Administration decision</u>

Plaintiff relies on a Seventh Circuit case for the proposition that Defendant is bound by the Social Security Administration's determination that Plaintiff was disabled. *See Ladd v. ITT Corp. et al.,* 148 F.3d 753 (7th Cir. 1998). The *Ladd* case is inapplicable to these proceedings.

13

First, in that case the court "proceed[ed] on the assumption that 'total disability' under the plan means . . . the same thing as under the social security disability program." *Id.* at 754. Under the social security statute

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2(A). In contrast, disability under the Plan is defined as the inability "because of injury or illness, to engage in any gainful occupation or profession for which [the Participant] is reasonably qualified or reasonably could become qualified by education, experience, capability or training." (D 14 & 492). A plain reading of the above language does not suggest the two are equivalent, nor does Plaintiff contend that the definition of "total disability" under the Plan is identical to that under the social security disability program. Second, the Ninth Circuit has upheld a denial of long-term disability benefits even where the claimant received social security benefits. *See Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279, 1285 (9th Cir. 1990) (decision to terminate benefits was not an abuse of discretion where the denial was supported by substantial evidence). For the reasons stated above, there is substantial evidence in the record supporting the denial of benefits.

Third, very recently a court in this district specifically addressed this issue, finding:

> [P]laintiff cites no case, and the Court has located none, in which a court has determined a claimant to be entitled to plan benefits solely because the plan administrator encourages a claimant to apply for SSA benefits and thereafter offsets plan benefits by SSA benefits. Rather, courts have held such conduct " 'does not provide an independent basis' " for judgment in favor of the claimant.

*Moskowite v. Everen Capital Corp.*, 2005 WL 1910941 *4 (N.D. Cal. Aug. 10, 2005) (Chesney, J.). Here, Plaintiff contends she was "compelled" by Defendant to apply for social security benefits. (Pl.'s P&A in Supp. of Mot., at 22). Though she fails cite to any document in the record which evidences this fact, even were the Court to accept that as true, Plaintiff has not provided any authority demonstrating that such conduct provides an independent basis for

14

1 judgment in her favor.

### 5. Defendant afforded Plaintiff a full and fair review

Finally, ERISA and its accompanying regulations require a "meaningful dialogue between the plan administrators and their beneficiaries." *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir.1997). Plan procedures cannot be "full and fair" without providing for this communication. *See Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir.1998) (holding that ERISA claimants are entitled to "timely and specific" explanation of benefit denials, and may not be "sandbagged" by post-hoc justifications of plan decisions).

Plaintiff alleges she was not afforded a full and fair review of her claim by Defendant because she was not provided an opportunity to review and comment on the IPRO report used by the ERISA Committee in the final denial of her claim. Plaintiff relies upon *Abram v. Cargill*, 395 F.3d 882 (8th Cir. 2005) wherein the Eight Circuit held that there can be no full and fair review where the "claimant is caught off guard when new information used by the appeals committee emerges only with the final denial." *Id.* at 886.

There was a "meaningful dialogue between the plan administrators" and Plaintiff. Plaintiff, Plaintiff's counsel and Plaintiff's medical providers exchanged numerous correspondence, opinions and reports with Defendant wherein Plaintiff asserted her disability, attempted to refute or explain Defendant's evidence of non-disability, and twice appealed the denial of benefits.

Further, contrary to Plaintiff's assertion, she was not "caught off guard" by the final denial of her appeal as the appeals committee did not consider any evidence that was not already in Plaintiff's possession. Thus, this is not an instance in which "new information" was used in the denial of benefits.

15

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED and Plaintiff's motion for partial summary judgment is DENIED.

IT IS SO ORDERED.

Dated: 2/28/06

SAUNDRA BROWN ARMSTRONG
United States District Judge